**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEBRASKA**

| | |
|---|---|
| NIEL ATKINSON, in his capacity as trustee of the Kathleen M Atkinson Irrevocable Trust, on behalf of himself and all others similarly situated, | ) ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) ) |
| LINCOLN BENEFIT LIFE COMPANY, | ) ) ) |
| Defendant. | ) ) |

CASE NO.

**CLASS ACTION**

**COMPLAINT FOR BREACH OF CONTRACT**

**JURY TRIAL DEMANDED**

Plaintiff, by and through the undersigned attorneys, brings this action on behalf of himself and all others similarly situated against Defendant Lincoln Benefit Life Company ("LBL").

**NATURE OF THE ACTION**

1.      This is a class action brought on behalf of Plaintiff and similarly situated owners of LBL life insurance policies. Plaintiff seeks to represent a class of LBL policyholders who have been subjected to unlawful cost of insurance ("COI") rate overcharges.

2.      The policies at issue in this case are flexible premium adjustable life insurance policies—also known as "universal life"—issued, insured, or assumed by LBL or its predecessor(s) in interest that were subjected to an "adverse change" in COI rates announced in or after 2024 (collectively, the "Policies").

3.      A main benefit of universal life policies generally, and the Policies specifically, is that, unlike other kinds of whole life insurance that require fixed monthly premium payments, the premium payments required for universal life policies are flexible and need only be sufficient to cover the cost of insurance charges and certain other specified expenses, which are typically levied each month.

4.      The cost of insurance charge, often called a COI charge, is typically the highest charge that a policyholder pays. Because the COI charge is a function of the COI rate, the policy provision explaining how the COI rates are determined is one of the most important parts of the contract.

5.      Here, the Policies issued to Plaintiff and other class members provide that "[t]he cost of insurance rate is based on the insured's sex, issue age, policy year, payment class and face amount. The rates will be determined by us, but they will never be more than the guaranteed rates[.]" As explained in more detail below, sex, age, duration, payment class (also known as "underwriting class"), and face amount are all well-known mortality factors.[1]

6.      In late 2024, LBL announced in letters to policyholders that "we are increasing your policy's current Cost of Insurance rates, which will change the overall Cost of Insurance deducted from policy values."

7.      Despite the policy language stating that COI rates will be "based on the insured's sex, issue age, policy year, payment class and face amount," the letters attempt to re-write the terms of the Policies. According to LBL's letters, COI rates are not "based on" those factors the Policies say but instead are only "assigned by reference" to those factors. Further, according to LBL's letters, LBL has the unfettered right to change COI rates "at our discretion" and subject only to "the contract guaranteed maximums." The letters then assert:

> The need to increase Cost of Insurance rates is driven by higher than anticipated future mortality experience in comparison to what was expected under original pricing assumptions. Specifically, the current Cost of Insurance rates, which were based on original pricing assumptions, are inadequate to cover the anticipated costs of providing the benefits under the similarly situated policy forms in force.

---

[1] For example, females are generally expected to live longer than males, and non-smokers are generally expected to live longer than smokers.

Nothing in the Policies permits LBL to increase COI rates to cover unnamed "anticipated costs of providing the benefits," or under "similarly situated policy forms in force," and even if they did, no change in anticipated costs could justify these massive COI increases.

8.      As discussed in more detail below, any claim of mortality deterioration is implausible. Not only has mortality dramatically improved industry-wide since the Policies were issued—even after accounting for COVID-19—but LBL has itself repeatedly certified to regulators that its own mortality experience has improved, that LBL expects mortality experience to continue to improve, and that its pre-adverse-change rates were supported by currently expected experience, including mortality experience. Given this history of mortality improvement, LBL was prohibited from imposing the adverse change in COI rates, and in fact should have reduced COI rates.

9.      Further, LBL's letters do not even say that mortality has deteriorated for the specific product owned by the policyholder; they make reference, in two different places, to "similarly situated policy forms in force." Nothing in the Policies permits LBL to raise COI rates because of its "anticipated costs of providing the benefits under the similarly situated policy forms in force."

10.      What is actually happening is that in 2020 LBL was acquired by private-equity backed Kuvare US Holdings, Inc.,[2] which in 2024 sold its asset management arm—Kuvare Insurance Services, LP—to private equity firm Blue Owl.[3] This is part of a growing trend of private equity firms acquiring legacy life insurers in order to increase the private equity firm's assets under management and to engage in creative and often risky financial engineering, such as entering into

---

[2] *See* Business Wire, *Kuvare Completes Acquisition of Lincoln Benefit Life Company* (Jan. 6, 2020), https://www.businesswire.com/news/home/20200106005783/en/Kuvare-Completes-Acquisition-of-Lincoln-Benefit-Life-Company.

[3] *See* Kassandra Jimenez-Sanchez, *Kuvare Asset Management to be Acquired by Blue Owl for $750m*, Reinsurance News (Apr. 3, 2024), https://www.reinsurancene.ws/kuvare-asset-management-to-be-acquired-by-blue-owl-for-750m/.

reinsurance transactions with offshore captive reinsurers subject to light regulation and lower reserve requirements,[4] and imposing unjustified adverse changes in COI rates using incorrect assumptions, impermissible factors, and manipulated methodologies. Unsurprisingly, private equity's entry into traditional life insurance has not gone well for policyholders. As just one example, PHL Variable Insurance Company was acquired by private equity firm Nassau Re in 2016.[5] Over the next five years, PHL hit its policyholders with two unlawful COI increases, and then in 2024 it was taken over by the Connecticut Insurance Commissioner due to its "hazardous financial condition,"[6] which resulted from its use of under-capitalized offshore captive reinsurers and risky related-party investments.

11.    The risks are particularly acute for customers of insurers, like LBL, that no longer issue new policies. For those "closed block" policies, the insurer typically no longer cares about customer service, reputation, or fairness, and often *wants* policyholders to lapse their policies before any death benefit has to be paid by the insurer. Indeed, some such insurers will increase COI rates knowing that the rate action is unlawful and will have to be rolled back, but not until after policyholders lapse their policies in response to it—a practice known in the industry as inducing "shock lapses." Here, LBL discontinued new business sales in the independent sales market in 2013. The impact of Kuvare's "creative" engineering on LBL is already apparent. In February 2025, KBRA, a credit rating agency, downgraded the "insurance financial strength

---

[4] *See generally* American Academy of Actuaries, *Issue Brief: Asset-Intensive Reinsurance Ceded offshore From U.S. Life Insurers (With Focus on Bermuda)* (Feb. 2024), https://www.actuary.org/wp-content/uploads/2024/02/risk-brief-bermuda-reinsurance_0.pdf; *see also* Kuvare, Key Reinsurance Transactions Boost Kuvare's Consolidated Assets to $27B (Dec. 17, 2020), https://kuvare.com/key-reinsurance-transactions-boost-kuvares-consolidated-assets-to-27b/ ("This is the first such reinsurance transaction for LBL since it was acquired by Kuvare last year and builds upon Kuvare's demonstrated track record of having previously closed offshore reinsurance transactions through a Bermuda subsidiary, Kuvare Life Re Ltd.").

[5] Greg Bordonaro, *Phoenix Sale Complete, CEO Steps Down*, Hartford Business Journal (June 20, 2016), https://hartfordbusiness.com/article/phoenix-sale-complete-ceo-steps-down/.

[6] Connecticut Insurance Department, *PHL Variable Insurance Company Rehabilitation*, https://portal.ct.gov/cid/phl?language=en_US (last visited Nov. 25, 2025).

ratings" of LBL, saying that "[t]he downgrade of LBL reflects the negative capital impact of its captive insurance company, lowered RBC base and stress targets, and Kuvare's decision to place the company in run-off rather than continue to use it as a vehicle for reinsurance transactions."[7]

12.    LBL and its private equity owner's desire to extract more profits or induce lapses through the adverse COI change has nothing to do with "the insured's sex, issue age, policy year, payment class and face amount" and is not a valid ground for a COI increase under the terms of the Policies. LBL cannot raise rates for non-mortality reasons. *See, e.g., Vogt v. State Farm Life Ins*. Co., 963 F.3d 753, 763–64 (8th Cir. 2020); *Meek v. Kansas City Life Ins. Co.*, 126 F.4th 577, 586 (8th Cir. 2025).

13.    As a direct result of LBL's actions, Plaintiff and the other members of the class have been required to pay and have paid exorbitant and unjustified COI charges. Plaintiff seeks relief for the COI overcharges that LBL has wrongly imposed and continues to impose on its policyholders.

## THE PARTIES

14.    Plaintiff Niel Atkinson is a resident and citizen of the state of Minnesota. Mr. Atkinson is the trustee of the Kathleen M Atkinson Irrevocable Trust, which is the owner of Policy No. 01N1177442, which was subject to LBL's unlawful COI increase.

15.    Defendant LBL is incorporated under the laws of the State of Nebraska and has its principal place of business in Lincoln, Nebraska. It is thus a citizen of Nebraska.

## JURISDICTION AND VENUE

---

[7] KBRA, *KBRA Downgrades Kuvare's Issuer, Debt and US Operating Companies Ratings and Affirms Kuvare Life Re Ltd.'s Rating* (Feb. 12, 2025), https://www.kbra.com/publications/vDVBvCNp/kbra-downgrades-kuvare-s-issuer-debt-and-us-operating-companies-ratings-and-affirms-kuvare-life-re-ltd-s-rating.

16.     This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the Complaint alleges claims on behalf of a national class of policyholders who are minimally diverse from LBL, as there are individuals who are members of the putative class that are citizens of a state other than Nebraska, and because the aggregate of these claims exceeds $5,000,000.

17.     This Court has personal jurisdiction over LBL because it is incorporated under the laws of the State of Nebraska and has its principal place of business in Lincoln, Nebraska. It is thus a citizen of Nebraska.

18.     Venue is proper in this District under 28 U.S.C. § 1391 because LBL is incorporated under the laws of the State of Nebraska and has its principal place of business in Lincoln, Nebraska, and therefore resides in this District. Indeed, as LBL has represented to federal courts across the country, Lincoln, Nebraska was LBL's principal place of business both before and after it imposed the COI increase at issue in this case. *See, e.g., Kraut v. Lincoln Ben. Life Co.*, 1:22-cv-07564, Dkt. 1 (S.D. Ill. Dec. 13, 2022) ("Specifically, Lincoln Benefit is a citizen of Nebraska, being a life insurance company organized and existing under the laws of the State of Nebraska, with its principal place of business at 1221 N Street, Lincoln, NE 68508."); *Lincoln Ben. Life Co. v. Carvajal*, 3:24-cv-06622-WHO, Dkt. 1 (N.D. Cal. Sept. 20, 2024) ("LBL is a life insurance company organized and existing under the laws of the State of Nebraska, with its principal place of business in Nebraska. LBL is therefore a citizen of Nebraska within the meaning and intent of 28 U.S.C. § 1332."); *Beddingfield Irrevocable Trust v. Lincoln Ben. Life Co.*, 2:25-cv-00080-Z, Dkt. 1 (N.D. Tex. Apr. 11, 2025) ("Lincoln Benefit is an insurance company organized and existing under the laws of the State of Nebraska, with its principal place of business in Lincoln, Nebraska."); *Lincoln Benefit Life Co. v. Garotti*, 1:25-cv-07777-PKC, Dkt. 1 (S.D.N.Y. Sept. 18,

2025) ("Lincoln Benefit Life Company is a life insurance company organized and domiciled under the laws of the State of Nebraska, with its principal place of business in Lincoln, Nebraska.").

19.     Further, as LBL itself represents in regulatory filings with the National Association of Insurance Commissioners (NAIC), Lincoln, Nebraska is the location of LBL's Statutory Home Office, Main Administrative Office, and the "Principal Location of Books and Records."

20.     Because Nebraska is LBL's domicile state, the Nebraska Department of Insurance ("Nebraska DOI") was the first state regulator that LBL notified of the COI increase. Specifically, in LBL's October 11, 2024 "Informational Filing" with the Nebraska DOI, LBL stated "As Nebraska is our state of domicile, LBL is submitting this correspondence to the Nebraska Department of Insurance prior to contacting other states' insurance departments." The return address line on this Informational Filing was "Lincoln Benefit Life, 1221 N Street, Suite 200, Lincoln, NE 68508."  Because state regulators do not approve COI increases, this letter was for informational purposes only and contained the same generic explanation that was provided to policyholders. Among other things, the filing did not contain any actuarial analysis substantiating LBL's assertion that "the need to increase Cost of Insurance rates is driven by higher than anticipated future mortality experience in comparison to what was expected under original pricing assumptions," nor did it include LBL's original pricing assumptions or its current assumptions.

## FACTUAL BACKGROUND

### A.     The LBL Policies at Issue

21.     The Policies are flexible premium adjustable life insurance policies, also known as "universal life," issued or assumed by LBL (or its predecessors). Traditionally, life insurance companies sold two types of policies: term and whole life insurance. Term life insurance is for a term of years, normally building up no cash value and expiring without value. Whole life insurance

provides coverage for life and provides an increasing cash value that is available when needed. The premiums remain level throughout the life of the policy.

22.     Universal life insurance emerged in the 1980s and provides more flexibility than whole or term life insurance. Universal life combines an "insurance" component and a "savings" component, and there are no fixed or minimum premium payments required by the policies. Unlike other kinds of whole life insurance that require fixed monthly premium payments, the premiums required for universal life policies need only be sufficient to cover the COI charges and certain other specified expenses, with amounts in excess of that being applied to the policy account (sometimes known as "policy value", "account value" or "cash value") and accumulating interest at a declared interest rate not less than the guaranteed minimum interest specified in the policy.

23.     Universal life policies also traditionally have an "unbundled" charge structure, with different charges for different cost components. The COI charge is typically the highest charge that a policyholder pays and is commonly referred to in the industry as the "mortality charge" because it is supposed to correspond to the mortality risk that the insurer is assuming. The COI charge is deducted from the policy value (i.e., the savings component) of the policy every month.

24.     In addition to COI charges, LBL imposes other charges, including a monthly policy fee, a monthly administrative expense charge, and a premium expense charge, the latter of which is deducted from each premium payment and goes directly into LBL's pockets. LBL also makes money by investing the policy value, and collecting for itself the difference between the credited rate and the rate that LBL actually earns investing the policyholders' money. As mentioned above, this revenue stream has made life insurers a target for private equity firms and alternative asset managers, allowing them to profit from investing policyholder funds by using riskier strategies than traditional insurers.

25.     The size of the COI charge is highly significant to Plaintiff and all universal life policyholders for at least two important reasons. First, it informs the minimum amount of money they must pay to keep a policy in force. Second, high COI rates can quickly diminish a policy's policy value (i.e., the savings component) and reduce the amount of money on which the policyholder can earn interest. Even small changes in the COI rate can produce a dramatic increase in the dollar amount of the COI charged by LBL. The higher the COI rate, the greater the premiums required to maintain a positive balance in the policy value. Generally, if a policy value diminishes such that it is insufficient to cover surrender charges and COI charges, and the appropriate time expires after LBL provides an accurate and adequate grace notice, then a policy may lapse unless additional premiums are paid in.

26.     The Policies contain provisions like the following that explain the COI charge and COI rates:

*cost of insurance*

The cost of insurance is determined as follows:

1.  Divide the death benefit as of the prior monthly activity day by 1.0032737.
2.  Subtract the policy value as of the prior monthly activity day;
3.  Multiply the result by the current cost of insurance rate divided by 1000. The cost of insurance rate is based on the insured's sex, issue age, policy year, payment class and face amount. The rates will be determined by us, but they will never be more than the guaranteed rates shown on Page 6.

The cost of insurance charge is zero on and following the policy anniversary following the insured's attained age 100.

27.     This provision limits what the COI rate is "based on," namely, "the insured's sex, issue age, policy year, payment class and face amount." LBL is not permitted, for example, to

increase COI rates simply because it wants more profit, or because of "anticipated costs of providing the benefits under the similarly situated policy forms in force."

28.     Sex, age, policy year, payment class, and face amount are all mortality factors that are commonly used by insurers in setting their mortality expectations:

- Sex: Females typically have lower mortality than males;

- Age: Mortality generally increases with age;

- Policy year: The longer a policy has been in force, the further out an insured is from the original underwriting, and mortality tables generally have "select" rates for insureds that have recently been insured and gone through an underwriting selection process, and "ultimate" rates for when the initial selection effect has worn off;

- Payment class: Also known as underwriting class (e.g., preferred non-smoker, standard non-smoker, smoker), with non-smokers and those in good health generally having lower mortality; and

- Face amount: Policies with higher face amounts generally have lower mortality, because the insureds tend to be wealthier, and wealth is correlated with lower mortality.

29.     The Policies are all issued on standardized form policies, and owners are not permitted to negotiate different terms. They are all contracts of adhesion.

**B.      LBL's Announcement of the Unlawful COI Rate Hike**

30.     Beginning in late 2024, LBL suddenly announced a massive COI increase on the Policies.

31.     LBL began to notify Policyholders of the COI increase in written correspondence in late 2024. In the letters, LBL purported to explain why it was "increasing your policy's current Cost of Insurance rates, which will change the overall Cost of Insurance deducted from policy values":

**Cost of Insurance Rates**
Cost of Insurance rates are used in calculating the monthly Cost of Insurance deductions from your policy values. Cost of Insurance rates are assigned by reference to the insured's sex, issue age, policy year, rate class and face amount. For unisex issues, rates are not based on the sex of the insured. Cost of Insurance rates are not guaranteed, though they are subject to contractually guaranteed maximums. Consistent with your policy you received, at our discretion and subject to the contract guaranteed maximums, we can change monthly Cost of Insurance rates. Please refer to your policy you received for the guaranteed maximum scale of charges.

**Nature and Effect of this Change in Monthly Cost of Insurance Rates**
The need to increase Cost of Insurance rates is driven by higher than anticipated future mortality experience in comparison to what was expected under original pricing assumptions. Specifically, the current Cost of Insurance rates, which were based on original pricing assumptions, are inadequate to cover the anticipated costs of providing the benefits under the similarly situated policy forms in force. Therefore, LBL is implementing a Cost of Insurance rates increase pursuant to the terms of your policy, to address the projected adverse experience with respect to all similarly situated policy forms in force. The increased Cost of Insurance rates will not exceed the guaranteed maximum Cost of Insurance rates listed in your policy. Accordingly, neither the text of your policy nor any guaranteed contract values will change.

The increase in the Cost of Insurance rates will produce a lower policy value than previous Cost of Insurance rates and may increase the risk of policy lapse based on continued payment of current premiums.

32.     Several things are notable about this explanation. First, while the Policies state that COI rates "are based on" the specified mortality factors, LBL now claims that they are merely "assigned by reference to" those factors. Second, LBL suggests that it "can change monthly Cost of Insurance rates" "at [its] discretion and subject [only] to the contract guaranteed maximums," but no such language is found in the Policies. Third, the letters make two opaque references to increased costs associated with "similarly situated policy forms in force," but do not explain what LBL considers to be a similarly-situated policy form and, in any event, nothing in the Policies says that COI rates can be increased because of "anticipated costs of providing the benefits under the similarly situated policy forms in force."

33.     LBL's efforts to rewrite the policy language fail, and as discussed below its opaque claim of mortality deterioration is implausible and contradicted by its own statements to regulators. LBL began imposing the adverse COI rate change on the Policies on or about December 1, 2024, resulting in a massive increase in the premiums necessary to maintain coverage. The letters acknowledge that the increase "will produce a lower policy value than previous Cost of Insurance rates and may increase the risk of policy lapse based on continued payment of current premiums."

11

### C.    LBL's COI Overcharges are Unlawful

34.    The Policies do not authorize LBL to charge COI rates in whatever amount or by whatever method it determines. Rather, the Policies state the COI rate "is based on the insured's sex, issue age, policy year, payment class and face amount." LBL's stated reasons for the adverse rate change do not conform with this language and indeed attempt to rewrite it.

35.    LBL's claim of mortality deterioration—which it discusses only in the context of "similarly situated policy forms in force"—is also implausible. Insurers like LBL typically set and quantify their mortality expectations annually. They perform experience studies which examine their historical mortality experience and, from that mortality experience, develop predictions of mortality they expect to see in the future. These expectations are explicitly quantified in the form of mortality tables, which are charts showing the expected rate of death at a certain age. These tables, once established, are objectively reflected in insurers' records and used in the preparation of financial statements and regulatory submissions. Rate of death can be measured as a percentage or in terms of the number of deaths per thousand. As discussed above, separate tables or adjustment factors are produced to reflect groups with different mortality, such as males and females, smokers and non-smokers, and different ages, durations, and face amount bands. Mortality tables are used by actuaries to calculate insurance rates, and, if developed properly, are designed to reflect the carrier's expectations of future mortality.

36.    The Policies appear to have been priced using at least in part 1980 Commissioners Standard Ordinary Mortality Table ("1980 CSO Mortality Table"), which is an industry standard table that was published by the Society of Actuaries ("SOA") and endorsed by the National Association of Insurance Commissioners ("NAIC"). In the "Surrender Value" section of the Policies, LBL makes explicit reference to "the 1980 CSO Mortality Table, age last birthday, male

12

or female, smoker or nonsmoker, as applicable." The 1980 CSO Mortality Tables were the industry-standard table until 2001.

37.    In 2001, at the request of the NAIC, the SOA and the American Academy of Actuaries produced a proposal for a new CSO Mortality Table. The accompanying report from June 2001 identified that expected mortality rates had improved significantly each year since the 1980 CSO Mortality Tables were issued. The report stated:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted. … [C]urrent mortality levels … are considerably lower than the mortality levels underlying the 1980 CSO Table.

38.    The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to 80% of the 1980 CSO Table."

39.    The 2001 CSO Mortality Table, in turn, was updated about 14 years later by the SOA, producing the "2017 CSO Mortality Table." The SOA report was published in October 2015 and showed further significant reductions in insurance company reserves compared to the 2001 CSO Mortality Table due to mortality improvements since 2001.

40.    This trend of improving mortality expectations has continued to the present day in the industry. For example, statistics published by The Human Mortality Database (HMD, organized by the Department of Demography of the University of California, Berkeley), show lowering of mortality rates between 2003 (the year the Plaintiff's policy was issued) and 2023 (the latest year for which HMD statistics are available) for older-aged individuals in the United States.[8]

41.    Even the emergence of COVID-19 has not changed the general trend of mortality improvement. COVID-19 did not emerge until 2020, and the increase in mortality resulting from

---

[8] Human Mortality Database, https://www.mortality.org/Home/Index (last visited Nov. 25, 2025).

13

that was (a) relatively small in historical terms, (b) generally viewed by the industry as transitory, with insurers, including LBL, still projecting future mortality improvement to continue. Indeed, industry reports note that by 2022 the effect of COVID-related mortality was already waning, and COVID-19 deaths have continued to decline each year since then.

42.    LBL's own regulatory filings confirm that mortality has improved not only industry-wide, but for LBL's universal life policies specifically. Each year, life insurers must file as part of their annual statements to the NAIC a "Statement in Response to Interrogatory 3 of Exhibit 5," which is a response to various questions related to non-guaranteed elements such as COI rates. Question number 4 asks "Are the anticipated experience factors underlying any non-guaranteed elements different from current experience? If yes, describe in general terms the way in which…." One purpose of this question is to require insurers to evaluate and certify whether experience is changing that would require an adjustment in non-guaranteed elements such as COI rates.

43.    Every year from 2015 to 2022—including during the height of COVID-19—LBL provided the same answer: "Yes. Some expected future mortality improvement is included in developing cost of insurance rates for UL plans. Such improvement is based on recent trends and expectations for future mortality." In other words, LBL was saying that the only way in which current mortality experience differed from that assumed when COI rates were originally set was that mortality had *improved* and was expected to continue to improve.

44.    The first time that LBL changed its answer was in February 2024, around the time of LBL's indirect acquisition by an alternative asset manager (Blue Owl Capital), where LBL again acknowledged the trend toward future mortality improvement, but added a sentence at the end saying "[f]or some UL plans, mortality experience over time is emerging differently (more

14

adverse) than originally expected." But negative mortality does not emerge in one year, nor could it offset the continued improvement recognized in all the prior years. And even in that 2023 response, the company stated there is no "substantial probability" that its illustrations "cannot be supported by currently expected experience."[9] Translated, that means that even in 2023, the company agreed that its then-current COI rates (i.e., the pre-adverse-change rates) were appropriate in light of its recent mortality experience. And yet, less than a year later, LBL abruptly and adversely changed COI rates, based on factors other than the enumerated mortality factors, and LBL thereby deducted more than what the policies stated would be included in COI rates.

45.     Exhibit 5 to the NAIC filing also shows that the reason for the increase in COI rates provided to policyholders is contradicted by LBL's own statutory filings. The COI increase letter states that "The need to increase Cost of Insurance rates is driven by higher than anticipated future mortality experience in comparison to *what was expected under original pricing assumptions*." However, according to the statutory Exhibit 5 filing, up until 2022, other than the mortality improvement assumption, the anticipated experience factors, including anticipated mortality experience, underlying the COI rates, did not differ from current experience. And the impact on mortality from COVID decreased from 2022 to 2025. Improving mortality should result in a decrease in COI rates, not an increase.

46.     Even assuming that LBL could consider factors beyond mortality, such as unnamed "anticipated costs of providing the benefits under the similarly situated policy forms in force," none of them could justify a rate increase and in fact require a lowering of rates. In 2018, insurers

---

[9] Under ASOP 24, illustrated rates must be based on "actual recent historical experience." *See* ASOP 2 § 3.2 (defining "Disciplined Current Scale" as "[a] scale of nonguaranteed elements, certified annually by the illustration actuary, constituting a limit on illustrations currently being illustrated by an insurer that is reasonably based on actual recent historical experience and that satisfies the requirements set forth in the Model."). This means that an insurer is not permitted to continue to illustrate COI rates that are not supported by its actual recent experience.

received a giant tax cut through the Tax Cuts and Jobs Act, which reduced the corporate federal tax rate from 35% to 21%. Insurers reported billions of dollars in windfall gains as a result. Prudential, for example, recognized a $2.88 billion tax benefit in its Consolidated Statements of Operations for the year ended December 31, 2017. Manulife, which owns U.S.-based life insurers John Hancock Life Insurance Company (U.S.A.) and John Hancock Life Insurance Company of New York, reported in 2018 that the expected impact of the TCJA is an "[e]xpected ongoing benefit to net income attributed to shareholders and core earnings of approximately $240 million per year commencing in 2018."[10]

47.    Investment returns for insurers have likewise significantly improved over the past decade, particularly in the high-interest-rate environment of the past 3.5 years. As for expenses, LBL already charges a separate administrative expense charge, as well as a 6% premium expense charge, and in any event there has not been any material increase in expenses reported by other insurers or in industry surveys.

## CLASS ACTION ALLEGATIONS

48.    This action is brought by Plaintiff individually and on behalf of a class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure. The Class consists of:

> All owners of universal life insurance policies (including variable and group universal life policies) issued or assumed by Lincoln Benefit Life Company, or its predecessors-in-interest, that were subjected to any cost of insurance rate increases announced in letters sent to policyholders in or after 2024.

49.    Plaintiff reserves the right to propose subclasses grouped by state(s) of issue and/or product.

---

[10] Manulife Financial Corporation, Fourth Quarter 2017: Financial Operating Results, at 21 (Feb. 8, 2018), *available at* https://www.manulife.com/content/dam/manulife-com/ca/financial-documents/investors/MFC_QRS_2017_Q4_EN.pdf.

16

50.     The Class consists of hundreds of LBL policyholders and is thus so numerous that joinder of all members is impracticable. The identities and addresses of the members of the Class can be readily ascertained from business records maintained by LBL.

51.     The claims asserted by Plaintiff are typical of the claims of the Class Members.

52.     Plaintiff is willing and prepared to serve the Court and the proposed Class in a representative capacity. Plaintiff will fairly and adequately protect the interests of the Class and have no interests that are adverse to, or which materially and irreconcilably conflict with, the interests of the other members of the Class.

53.     The interests of Plaintiff are co-extensive with and not antagonistic to those of absent Class members. Plaintiff will undertake to represent and protect the interests of absent Class members.

54.     Plaintiff has engaged the services of counsel who are experienced in complex class litigation and life insurance matters, including COI increase matters, who will adequately prosecute this action, and will assert and protect the rights of and otherwise represent Plaintiff and the putative Class members.

55.     Plaintiff requests that the Court afford class members with notice and the right to opt-out of any class certified in this action. The names and addresses of all class members are in LBL's business records, and class members are readily and objectively identifiable.

56.     This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the class predominate over those questions affecting only individual members. Those common questions include:

a. the construction and interpretation of the form insurance policies at issue in this litigation;

b. whether LBL's actions to adversely change the COI rates on certain universal life policies violated the terms of those form policies; and

c. whether Plaintiff and class members are entitled to receive damages as a result of the unlawful conduct by defendant alleged herein and the methodology of calculating those damages.

57. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a. because of the complexity of issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress individually for the wrongs that defendant committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

b. when defendant's liability has been adjudicated, claims of all class members can be determined by the Court;

c. this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

d. without a class action, many class members would continue to suffer injury, and defendant's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of its wrongful conduct; and

e.    this action does not present any undue difficulties that would impede its

management by the Court as a class action.

## CLAIM FOR RELIEF

### Breach of Contract

### (on behalf of Plaintiff and the Class)

58.    Plaintiff realleges and incorporates all allegations of this complaint as if fully set forth herein.

59.    The Policies are binding and enforceable contracts.

60.    At all relevant times, Plaintiff and other class members have paid premiums to LBL and have otherwise performed all their obligations under the Policies.

61.    The COI rate increase has materially breached the Policies in several respects outlined above, including because the stated reasons for the increase breach the plain terms of the Policies, the stated reasons for the increase are factually incorrect, and LBL failed to base COI rates on the enumerated mortality factors.

62.    In the event that any breach alleged herein is not explicitly covered by the terms of the contract, LBL has breached the covenant of good faith and fair dealing by the conduct alleged above.

63.    Plaintiff has performed all obligations under the policies, except to the extent that the obligations have been excused by LBL's conduct as set forth herein.

64.    As a direct and proximate cause of LBL's material breaches of the policies, Plaintiff and class members have been—and will continue to be—damaged as alleged herein in an amount to be proven at trial. These damages include not only COI overcharges resulting from the COI rate

19

increase itself, but also from LBL's failure to decrease COI rates in response to improved mortality expectations.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class, pray for judgment as follows:

1.  Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.  Awarding Plaintiff and the Class compensatory damages, restitution, disgorgement, reinstatement of lapsed and/or surrendered policies, and any other relief permitted by law or equity;

3.  Awarding Plaintiff and the Class pre-judgment and post-judgment interest as well as attorneys' fees and costs as permitted by law, and all other relief set forth above; and

4.  Awarding Plaintiff and the Class such other relief as this Court may deem just and proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and the Class hereby demand a trial by jury in Lincoln, as to all issues so triable.

20

DATED: March 19, 2026                    Respectfully submitted,


By: /s Trenten P. Bausch
    Trenten P. Bausch, #20655
    Andre R. Barry, #22505
    Stavros P. Piperis, #27911
    CLINE WILLIAMS WRIGHT
      JOHNSON & OLDFATHER, L.L.P.
    Sterling Ridge | 12910 Pierce St., Suite 200
    Omaha, NE  68144
    Telephone: (402) 397-1700
    Facsimile: (402) 397-1806
    tbausch@clinewilliams.com
    abarry@clinewilliams.com
    spiperis@clinewilliams.com

    Seth Ard (*pro hac vice* forthcoming)
    New York State Bar No. 4773982
    Ryan Kirkpatrick (*pro hac vice* forthcoming)
    New York State Bar No. 5643721
    Zachary Savage (*pro hac vice* forthcoming)
    New York State Bar No. 5220496
    Jacob Levin (*pro hac vice* forthcoming)
    New York State Bar No. 6247589
    SUSMAN GODFREY L.L.P.
    One Manhattan West
    New York, NY 10001
    Telephone: (212) 336-8330
    Facsimile: (212) 336-8340
    sard@susmangodfrey.com
    rkirkpatrick@susmangodfrey.com
    zsavage@susmangodfrey.com
    jlevin@susmangodfrey.com

Steven G. Sklaver (*pro hac vice* forthcoming)
California State Bar No. 237612
Glenn Bridgman (*pro hac vice* forthcoming)
California State Bar No. 298134
Halley Josephs (*pro hac vice* forthcoming)
California State Bar No. 338391
Michael Adamson (*pro hac vice* forthcoming)
California State Bar No. 321754
Kim Page (*pro hac vice* forthcoming)
Arizona State Bar No. 022631
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
ssklaver@susmangodfrey.com
gbridgman@susmangodfrey.com
hjosephs@susmangodfrey.com
madamson@susmangodfrey.com
kpage@susmangodfrey.com
*Attorneys for Plaintiff*